Affirmed and Memorandum Opinion
filed October 8, 2009.

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00295-CR



Koy Timon Moore, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 208th District Court

Harris County, Texas

Trial Court
Cause No. 1066922



 

MEMORANDUM OPINION 

Appellant, Koy Timon Moore, appeals from his
conviction for murder.  A jury found appellant guilty and assessed punishment
at sixty years’ imprisonment.  In four issues, appellant contends that the
evidence was legally and factually insufficient to sustain the conviction and
that evidence of appellant’s drug dealing was admitted in violation of Rules
403 and 404 of the Texas Rules of Evidence.  We affirm.

Background

Sometime around midnight on April 25, 2006, Jermore
Jones was shot and killed at the Miami Gardens apartment complex in Houston.[1]  Hortencia Martinez
testified that around 11:00 or 11:30, she heard about eight or nine gunshots
outside the window of her apartment.  She went to her grandchildren’s bedroom
to check on them, and when she looked out the window, she saw a man lying on
the ground but did not see anyone else.  About a minute later, after attending
to her grandchildren, Martinez again looked out the window and this time saw
two black men kneeling by the prone man and looking through his pockets.  She
recognized the two men from having seen them around the apartment complex.  One
of the men took a plastic bag out of the prone man’s pocket, and one of them
also extracted “a white metallic” object, which could have been a cellular
telephone or a small pistol.  Both men then left the scene.

Tiffany Preston testified that she is originally from
New Orleans and came to Houston when her home was destroyed in the aftermath of
Hurricane Katrina.  In Houston, she met appellant, who was also from New
Orleans, and they entered a romantic relationship and eventually had a child
together.  Preston admitted that at the time of trial, she was on probation for
felony possession of a controlled substance with intent to deliver.  Preston
pleaded guilty and received probation on May 1, 2006, but she stated that she
did not have an agreement to testify in the present case at the time she
pleaded.  At some point while on probation, Preston was arrested for aggravated
assault.  The pending charges, however, were dismissed about a week before
appellant’s trial, and she was placed back on probation.  Preston again stated
that there was no agreement between her and any prosecutor by which charges
would be dismissed in exchange for her testimony.  She testified that in March
2006, she moved in with appellant at the Miami Gardens.  She said that during
that time period, appellant was making money selling cocaine.  She identified
photographs of two other men, whom she knew as “Shorty” and “Tyrone,” who
purchased drugs from appellant at the complex.  She also stated that Jermore
Jones, the murder victim, also sold drugs at the complex.  Appellant objected
to Preston’s testimony regarding appellant’s drug-dealing based on her having
given prior inconsistent statements and arguing that such testimony was more
prejudicial than probative.  The trial court overruled the objection.

Preston stated that appellant left their apartment at
around 11:00 p.m. on April 25, 2006.  About an hour and a half after appellant had
left, Preston heard seven or eight gunshots.  She tried contacting appellant
using the walkie-talkie function of her cell phone, but he did not answer.  She
then heard someone running up the steps to their apartment.  She opened the
door, and appellant entered, holding an automatic pistol, and sat on the sofa. 
Appellant said that he “had just killed somebody,” and asked her to go on the
balcony to see if the police had arrived.  When the police did arrive, an
officer asked Preston whether she had seen anything, and she responded “no.” 
Later, Preston asked appellant how he could sleep knowing he had just killed
someone, and appellant replied that he would “just go to sleep.  They’ll go to
sleep on [me], so [I’ll] go to sleep on them.”  Preston also asked appellant
why he had shot the man, and appellant responded “reppin’.”  Preston explained
that this meant that the other man had been making more money selling drugs.  She
said that the next time appellant left the apartment, he took the gun with him.

In a subsequent conversation about the shooting,
appellant told Preston that shortly before the shooting, he had had a
conversation with someone named “Ugg.”  Ugg then began a conversation with Jermore
Jones, whom Preston knew as “Ace.”  During this conversation, Ugg “talked Ace
out of [his] gun.”  Ugg then flashed the gun so that appellant could see that
Ace was no longer armed, and appellant “walked up and shot Ace.”  According to
Preston, appellant told her that he shot complainant “three times in the back
and five times in the front.”

            A few days after
the shooting, police officers entered Preston’s apartment and arrested her for
cocaine possession.  During the arrest, officers asked her if she knew someone
named “T.”  They discovered crack cocaine in the apartment she shared with
appellant.  While in custody, Preston was visited by Detective Brian Harris,
who wanted to speak to her about the murder investigation.  According to
Preston, Harris threatened to charge her with murder and take her children away
from her if she did not tell him what he wanted to hear.  Harris also
threatened to implicate Preston’s family members in the murder, including her
younger brother.  She said it “[s]cared [her] to death.”  Preston said that
Harris did not tell her what to say but that she then told him that appellant
had confessed the murder to her.  She admitted that during that first meeting,
she told Harris that appellant did not have a gun on the night of the shooting,
and she did not tell him about the pre-shooting conversation appellant allegedly
had with Ugg.  She told Harris that appellant sometimes went by the nickname
“K.”

After pleading guilty to the possession charge,
Preston remained in jail for some time.  When Harris returned to question her,
she again related the events of the night in question and continued to deny
that appellant had possessed a weapon that night.  She also again failed to
mention the conversation with Ugg.  Preston stated that she did not tell
everything she knew sooner because she was afraid that appellant would get in
trouble.

On cross-examination, Preston provided additional
details regarding the pressure she said was applied by police officers and
members of the district attorney’s office.  She said that she was kept in
confinement and that they made it clear to her how she was to testify.  She
further stated that on March 22, 2007, she spoke with an investigator for
appellant’s defense, whom she told that her statements to police were false and
that she was scared that they would retaliate against her or her family if she
did not say what they wanted her to say.  She indicated that she was saying
certain things because she was afraid and that she was more afraid of the
police than appellant.  On re-direct, Preston acknowledged that she still loved
appellant and had never been afraid of him.  She further stated that Detective
Harris, as well as members of the district attorney’s office, had encouraged
her to tell the truth and not lie about events.  She identified a letter that
she received from appellant in which appellant instructed Preston to “[p]lead
the Fifth” and say that the police had scared her into implicating him in the
murder.  When pressed as to which story was the truth, Preston said that
appellant had admitted killing someone.

Marcus Pruitt testified that he was currently
incarcerated at the Harris County Jail because of convictions for drug
possession, pistol possession, and forgery.  Pruitt further acknowledged that
he had previously been convicted of robbery as well as other drug possession
violations.  While at the jail, he met appellant, who asked Pruitt to help him
with some legal matters on his case.  Pruitt agreed but insisted that appellant
be honest about the case.  According to Pruitt, appellant then denied
committing the murder.  Pruitt also testified that he wrote a letter to the
prosecutor in appellant’s case, requesting that charges be filed against
appellant for throwing urine on Pruitt while in jail.  In the letter, Pruitt stated
that appellant had confessed to the murder of Jermone Jones and had told his
girlfriend to change her statement to police.  Pruitt testified that the
statements in the letter were untrue and that he had made them in retaliation
for appellant’s having thrown urine on him.  Pruitt denied ever telling the
prosecutor in person that appellant had confessed to the murder.[2]  Although
Pruitt had been presented in the State’s case-in-chief, in his closing
argument, the prosecutor urged the jury to simply disregard any evidence
concerning Pruitt.     

Tyrone Jackson testified that he was living at the
Miami Gardens apartments at the time of the shooting.  Jackson has a criminal
record including armed robbery, and he admitted to having been a user of crack
cocaine while at Miami Gardens.  Jackson identified appellant as someone he
knew by the nickname “T” and stated that he (Jackson) had purchased drugs from
appellant on a few occasions.  He testified, however, that he had purchased
most of his drugs from people he knew as “Shorty” and “Ace”; Ace being Jermore
Jones.  On the night of the shooting, Jackson was standing talking to some
people when he heard gunshots.  He turned toward the sound and saw two men
running.  He then saw “a few muzzle flashes,” and a third man, “the shooter,”
walked away.  Jackson identified appellant as the shooter.  While he did not
see anyone actually shot, Jackson said that when he walked back toward his
apartment, he heard someone scream and then saw Ace lying on the ground. 
Jackson knelt by Ace and asked him what had happened and why it had happened,
but Ace was not able to respond.  Ace was bleeding from several points, and
Jackson tried to console him.  Another person, someone named Richard, pulled a
couple of items out of Ace’s pockets, including a bag of marijuana and perhaps
a phone.  Jackson said that Ace carried a gun with him “pretty much” all the
time, but Jackson did not see it that night.

Jackson acknowledged that he had been arrested for Jones’s
murder a couple of days after the shooting.  Jackson initially lied to the
police, telling them that he did not know anything about the shooting.  He said
he was scared and did not want to implicate appellant for fear appellant might
hurt his sister, who lived nearby.  He figured he would “go through the
motions” because he knew he was not guilty and thus would not be convicted. 
About nine months later, after Jackson’s sister moved away from Miami Gardens,
he told the prosecutor about his observations on the evening in question.  He
said that he “was prepared to do what he had to do . . . to clear [him]self,”
but indicated that he was not just making up a story to be released.  Indeed,
he said that he has not been offered any “deal” for his testimony, although the
charges against him, both the murder charge and a robbery charge, were
subsequently dropped.  Defense counsel objected to the relevance of Jackson’s
testimony regarding appellant’s drug dealing, but the court again overruled the
objection.

Brian Harris, a sergeant with the Houston Police
Department, explained why investigators had initially suspected Jackson, based
on Martinez’s photo identification of the two men she saw knelling beside Jones’s
body, but how later the investigation came to focus on appellant. About a week
after the shooting, Harris called appellant’s cell phone number.  According to
Harris, after he identified himself to appellant over the phone, appellant said
“You the police?  Catch me if you can, [expletive deleted],” and then hung up
the phone.  Harris said that when he arrested appellant the next day, he
[Harris] recognized appellant’s voice as being that of the person he had spoken
to on the phone the day before.  Harris further testified that .45 caliber
ammunition was found in the apartment occupied by Tiffany Preston.

Dr. Albert Chu, an assistant medical examiner at the
Harris County Medical Examiner’s Office, performed an autopsy on Jermore
Jones.  Chu testified that Jones died from multiple gunshot wounds, including
at least one that entered through his back.

Mohamed Almohamed, a criminalist for the firearms
section of the Houston Police Department, testified that nine fired cartridge
casings found at the scene of the murder were all from a .45 automatic.  He
further concluded that all of the casings had been fired from the same weapon. 
Additionally, Almohamed stated that seven bullets retrieved from the scene were
all .45 caliber and were fired by the same weapon.  He could not say with
certainty, however, that the same weapon from which the casings came also fired
the retrieved bullets.

Sufficiency of the Evidence

In his first two issues, appellants attacks,
respectively, the legal and factual sufficiency of the evidence to support the
jury’s verdict.  Because appellant does not differentiate in his arguments
between the differing standards for legal and factual sufficiency analysis, we
will address the arguments altogether while keeping in mind the distinct
standards of review.  Appellant was convicted of murder for either (1) unlawfully,
intentionally, or knowingly causing Jermore Jones’s death by shooting him with
a deadly weapon, or (2) causing Jones’s death by intentionally or knowingly
committing an act clearly dangerous to human life, namely shooting Jones with a
deadly weapon, while unlawfully intending to cause serious bodily injury to
Jones.  See generally Tex. Penal Code § 19.02(b) (1) and (2).

In a legal sufficiency review, we view all of the
evidence in the light most favorable to the verdict and determine whether a trier
of fact could have found each element of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Young v. State,
14 S.W.3d 748, 753 (Tex. Crim. App. 2000).  The jury is the exclusive judge of
the credibility of witnesses and of the weight to be given to their testimony;
it is the exclusive province of the jury to reconcile conflicts in the
evidence.  Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App.
2000).  Thus, when performing a legal sufficiency review, we may not reevaluate
the weight and credibility of the evidence and substitute our judgment for that
of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim.
App. 1999).  We must resolve any inconsistencies in the testimony in favor of
the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In a factual sufficiency review, we consider all of
the evidence in a neutral light, favoring neither party.  Watson v. State,
204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d
795, 799 (Tex. Crim. App. 2005).  We then ask whether (1) the evidence
supporting the conviction, although legally sufficient, is nevertheless so weak
that the jury’s verdict seems clearly wrong and manifestly unjust, or (2)
considering conflicting evidence, the jury’s verdict is against the great
weight and preponderance of the evidence.  Watson, 204 S.W.3d at 414-15,
417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). 
Additionally, we must give due deference to the jury’s determinations,
particularly those concerning the weight of the evidence and the credibility of
witnesses.  See Johnson, 23 S.W.3d at 8-9.

Appellant contends that the evidence was legally and
factually insufficient because the key witnesses against him were not credible. 
As stated, generally speaking, the credibility and weight to be assigned to
witness testimony is for the jury to decide; however, at least when analyzing
the factual sufficiency of the evidence, a reviewing court may “substitute its
judgment for the jury’s on these questions ‘albeit to a very limited degree.’” 
Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006) (quoting Watson,
204 S.W.3d at 416-17).  Appellant points to the testimony of three witnesses in
particular as being incredible:  Tiffany Preston, Marcel Pruitt, and Tyrone
Jackson.  Appellant argues that absent the testimony of these witnesses, there
was no evidence “to put [a]ppellant’s hand on the gun that killed Jermore
Jones.”

Unquestionably, there were credibility issues
concerning the testimony of Preston and Pruitt.  Although Preston testified
that appellant had confessed to shooting Jones, she also acknowledged having
given multiple versions of events at different times, and indeed, she appeared
to give conflicting testimony in this very trial, telling both the prosecutor
and defense counsel what they wanted to hear.  Ultimately, when pressed by the
prosecutor as to where the truth lay, Preston said that appellant had confessed
the murder to her.  There was also evidence that Preston may (1) have been
pressured by authorities to testify a certain way, and (2) still have feelings
for appellant.  As is usually the case, it was incumbent upon the jury to
assess these opposing pressures on Preston and to determine what to believe of
her testimony and what to reject.  Newby v. State, 252 S.W.3d 431, 436
(Tex. App.—Houston [14th Dist.] 2008, pet. ref’d) (“The jury may believe or
disbelieve all or part of any witness’s testimony.”).  It was within the jury’s
authority to give Preston’s assertion at trial that appellant confessed the
murder at least some weight in their determination of his guilt.

Regarding Pruitt, neither the State nor appellant’s
appellate counsel suggests that any weight be given to Pruitt’s testimony or to
the letter he sent to a prosecutor.  Based on the parties’ positions on appeal
and the prosecutor’s urging the jury to disregard evidence relating to Pruitt,
we will not consider evidence relating to Pruitt in assessing the sufficiency
of the evidence for conviction.

Lastly, we look at Jackson’s testimony.  Similar to Preston,
Jackson testified about appellant’s drug dealing as a motive for the murder.  Jackson
also testified that he saw appellant fire a handgun in a location where,
shortly thereafter, Jackson discovered Jermone Jones lying on the ground,
bleeding.  This evidence, if believed by the jury, strongly supports a finding
of guilt.  Appellant points to the fact that Jackson acknowledged having
initially lied to the police, telling them that he did not know anything about
the shooting, and to the fact that Jackson himself was initially charged with
Jones’s murder and only implicated appellant some nine months later.  Jackson,
however, explained his early reluctance to implicate appellant by stating that
he did not want to get involved and that he was scared for his sister who lived
close to appellant.  He said that he revealed his information only after his
sister had moved away.  He further denied that he had been offered any “deal”
in exchange for his testimony.  In short, Jackson’s explanations for his change
of story are rational and logical.  It was within the jury’s authority whether
to believe his trial testimony.  See Newby, 252 S.W.3d at 436.

It should further be noted that other evidence could
have been considered by the jury as indicative of appellant’s guilt.  First, .45
caliber bullets, the same caliber used to shoot Jones, were found in the
apartment appellant shared with Preston.  See, e.g., Perkins v. State,
887 S.W.2d 222, 225 (Tex. App.—Texarkana 1994, pet. ref’d) (holding that fact
bullets of the same caliber as those used to commit a murder were found in the
defendant’s car linked the defendant to the crime).  Additionally, Sergeant
Harris testified that appellant told him over the phone: “Catch me if you can,
[expletive deleted].”  See, e.g., Butler v. State, 990 S.W.2d 298, 304
(Tex. App.—Texarkana 1999, no pet.) (considering defendant’s statement to
police, “[y]ou-all couldn’t catch me,” as indicative of guilt).  Based on this
evidence and the testimony of Preston and Jackson, we find that the evidence
was legally and factually sufficient to sustain the verdict.  We overrule appellant’s
first two issues.

Admission of Evidence

In his third and fourth issues, appellant contends
that the trial court erred in admitting evidence of his drug dealing because
such evidence permitted the jury to convict him based on general bad acts and
because the probative value of such evidence was outweighed by the danger of
unfair prejudice.  Evidence is relevant if it makes the existence of a fact
that is of consequence to the determination of the action more probable than it
would be without the evidence.  Tex. R. Evid. 401.  Evidence of extraneous
offenses, however, is generally inadmissible.  Moses v. State, 105
S.W.3d 622, 626 (Tex. Crim. App. 2003).  Evidence of other crimes, wrongs, or
acts may be admissible only if such evidence has relevance apart from character
conformity, for example, to establish identity, intent, motive, opportunity, or
preparation.  Tex. R. Evid. 404(b); Moses, 105 S.W.3d at 626.  If
evidence is relevant, it is presumed admissible.  Tex. R. Evid. 402.  However,
even if relevant, extraneous acts evidence can still be excluded if its
probative value is substantially outweighed by the danger of unfair prejudice. 
Id. 403; Moses, 105 S.W.3d at 626.  In conducting this balancing
test, a trial court has “wide latitude to exclude, or particularly in view of
the presumption of admissibility of relevant evidence, not to exclude
misconduct evidence as he sees fit.  So long as the trial court thus operates
within the boundaries of its discretion, an appellate court should not disturb
its decision, whatever it may be.”  Montgomery v. State, 810 S.W.2d 372,
390 (Tex. Crim. App. 1990).  Factors to be considered include: “(1) the
probative value of the evidence; (2) the potential to impress the jury in some
irrational, yet indelible, way; (3) the time needed to develop the evidence;
and (4) the proponent’s need for the evidence.”  Erazo v. State, 144
S.W.3d 487, 489 (Tex. Crim. App. 2004).

The evidence that appellant was a drug dealer was
essential to the State’s theory regarding appellant’s motive for killing
Jones.  See Clayton v. State, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007)
(holding that evidence of defendant’s involvement with drugs was relevant to
theory that murder was drug-related).  According to Preston and Jackson,
appellant and Jones were rival dealers in the same complex.  In her testimony,
Preston testified that she understood appellant as saying that he killed Jones
over the issue of who made more money selling drugs.  Proof of motive was
important to the State’s case because the State was unable to produce an
eyewitness who actually saw appellant shoot Jones.  Thus, the evidence was both
quite probative of appellant’s guilt for the murder and important to the
State’s case.

             While it is possible that evidence of
appellant’s drug dealing, an illegal endeavor held in low-esteem, could have
impressed jurors in an irrational, indelible way, it should also be noted that
dealing drugs is not a violent offense; hence, it would not be likely to
suggest to jurors that if appellant sells illegal drugs he probably also
murders people.  In short, the danger of unfair prejudice was not particularly
high.

Lastly, the time spent attempting to prove that
appellant sold illegal drugs was not out of proportion to the time required to
present such evidence or to the time spent on other inculpatory evidence.  In
other words, our review of the record does not reveal any undue emphasis on
this evidence.  Based on our analysis of the four balancing-test factors, we
find that the trial court did not abuse its discretion in admitting evidence of
appellant’s drug dealing.  We overrule appellant’s third and fourth issues.

We affirm the trial court’s judgment.

 

                                                                                    

                                                                                    /s/
Adele Hedges

                                                                                       
Chief Justice

 

Panel consists
of Chief Justice Hedges and Justices Seymore and Sullivan.

Do Not
Publish — Tex. R. App. P.
47.2(b).









[1]  Testimony from different
witnesses placed the time of the shooting either slightly before midnight on
April 25, or slightly after midnight on April 26.





[2]
Woody Woodruff, an investigator with the Harris County District Attorney’s
office, testified that when he met with Marcus Pruitt, Pruitt stated that
appellant had confessed to the murder of Jermore Jones.  Pruitt further told
Woodruff that he had told appellant that it was “stupid” for appellant to have
confessed to his girlfriend and that he (appellant) should get his girlfriend
to retract her statement to police.  According to Woodruff, Pruitt additionally
said that appellant had committed the murder “to sew up the drug dealing in
Miami Gardens.”